Welcome to the Ninth Circuit. We have Judges Schoepfel and Judge Noonan and myself. We will call the cases in the order that they are on the calendar. The first case, United States v. Antrim, has been submitted on the briefs. So we will go to the second case, United States v. Mullin. Yes. My name is Charles Burris Juarez, and I represent Mullin. Come to the podium, please. You're in charge of your own time. You may reserve whatever time you like, but you have to keep track yourself. And as I understand it, Your Honor, we have 10 minutes for each side? That's correct. And I should say, because it's useful to know, that I tend to be not completely punctilious, but somewhat, i.e., you might possibly get an extra minute or two or three. Well, Your Honor, I'm going to try to start with 5 or 6 minutes, and I don't want to be redundant with respect to the arguments that have been made in the briefs. But I think the common point to all of the arguments relating to the three enhancements in this case is that they all manifest a misunderstanding on the part of the district court of the role that Mr. Mullin played. The district court failed to distinguish between the initial tech-kiting scheme of roughly $397,000, a scheme which Mr. Mullin had nothing to do with, didn't even learn about. And so after it occurred to him... Weren't there several hundred thousand dollars after he learned of it? Your Honor, I understand that the loans that Mr. Mullin did know about totaled approximately $85,000 or $86,000. But I thought that after he learned of the tech-kiting scheme, there was additional tech-kiting to the tune of several hundred thousand dollars, even though he wasn't necessarily aware of it at the time, but there was, factually. Well, there may have been. Certainly not to his knowledge. Certainly he was not conscious of them. What he was conscious about were loans that were taken. I understand that. Is he being charged with tech-kiting that occurred before he knew about the scheme? In the sentencing hearing... Yes. ...he was charged with the entire loss, even though he didn't know about the $397,000 And that isn't just post-February 15th tech-kiting? That's my understanding, Your Honor. And that's why we tried to raise that point repeatedly with the district court. And on this appeal, may I interrupt you? Yes. You're going to have to help me now because I'm not – I don't understand it the way you have presented it. I understand that the tech-kiting that was carried on prior to the time he had knowledge of it was not part of the computation as far as the points were concerned on the sentencing guidelines. Am I right in that? I view it differently, Your Honor. My understanding is that the PSR recommendation and the district court's rationale at sentencing took into account the entire amount of the checks that were kited, plus the loans that the district court felt were fraudulent thereafter, which totaled $85,000 or $86,000. Okay. Help me, because if that's true, then that clarifies it for me. And... I did not understand. And what we tried to highlight in our papers is the district court's apparently All right. Let me just backtrack on that a minute. According to the PSR, for example, there was at least $250,000 worth of bad checks between February 16th and March 1st. Maybe there was more. Let's assume for now that at least, as I said, at least several hundred thousand dollars, if not all, of those kited checks was after February 15th. All right? Does that change your argument? Well, certainly we still don't have an accurate amount of money. All right. Let's assume as to any amount that was written after February 15th, I don't know exactly what it is, but it seems to have been at least several hundred thousand dollars. Well, that might affect the first argument with respect to the amount of the loss. It would probably not affect the... So you're not arguing with respect to the amount of the loss that the kited checks after February 15th should not be attributed to him? I am arguing that, Your Honor.  And that's what I argued to the district court. That's what I thought. So even after February 15th, the kited checks should not be attributed to him? That's Mr. Mullin's position here. It was Mr. Mullin's position at the district court. Okay. Yes. Could I ask you a question as to how the scheme worked at any point? I assume they had some time to cover themselves, but for the work they had to be ready to repay the loans when the checks did come due, didn't they? That's correct. And they miscalculated, obviously. So it was essentially a scheme for short-term loans. It was, yes. It was sort of a shell game in that respect. And so when they did it after the scheme was known, they must have known they had to – if anybody did it, it was a kind of crazy thing to do. Yes. But then again, we're not claiming these people were terribly sophisticated. No. I see that. But wasn't it – this is another – this is something I – there are several things I don't understand. First of all, from Mr. Mullin's point of view, he gave them two weeks to basically pay up, right? Correct. Didn't they have to keep kiting the checks in the meanwhile? What would they have done if they didn't? Well, they could take out loans to cover those – Yes, and he was working with them to take out loans. Yes. But over that two-week period, if they had just stopped kiting the checks, there would have been huge, obvious losses on the accounts, right? And I'm sort of asking whether it wasn't completely foreseeable to him that over that two-week period, they necessarily had to keep kiting the checks, or otherwise they would have ended up with big holes in the accounts. Well, Mr. Mullin's statement to the district court – I'm sorry? Mr. Mullin's position with the district court is that he was not aware that said kiting – Well, I wasn't aware, but wasn't he aware that there was really – by giving them two weeks, he had to be giving them two more weeks to do this, because otherwise they would have ended up with huge – until they could get the loans, with huge uncovered shortages in their accounts, right? Actually, Your Honor, that's not an issue that even came up in the district court. Neither the trial judge nor the government raised the spectrum that somehow Mr. Mullin had to be unbelievably naïve or unsophisticated or had criminal intent in order not to foresee that that kiting would continue. I understood the discussion when they met together was, well, you've got relatives. The relatives can give you money. They'll cover it. That's all the evidence I've seen as to what was planned. Go to your relatives, cash in your retirement. You can find the money someplace. As far as I could see in the evidence.  That's my view of the evidence, Your Honor. And beyond that, there was genuine anger, shock, astonishment on the part of Mr. Mullin, that all of this took place before he learned about it, even his wife. All right. Now I have a narrower question. Have you figured out – you had a – he got a substantial downward departure, right? Yes. All right. Have you sat and calculated, because I couldn't quite figure this out, that if he got – if the substantial financial jeopardy were eliminated and he wasn't given – made responsible for, let's say, all the check-hiding, but he was for the loans. Yes. Do you get down below the sentence he already got? Yes, you do. By how much? You could get down to a level 7 or 8. You start out at a basic – In order to do that, you have to eliminate the additional points that were given by reason of the concern and the stabilization of the credit union. If you can't get rid of that when you're dead, aren't you – Well, you start off at office level 26, but if you eliminate 9 points for – But wait a minute. If you – you're then eliminating not only the check-hiding, but the loans, right? Let's say he was responsible for $85,000 in loans. Yes. Okay. Where does that put you? I have not calculated that difference in the amount of the loss, but there is a difference between 85 – It's a difference, but it's a difference enough that if you put that in and you put in the – There were a couple other upward enhancements as well. There were 10 others in addition. There were 7 levels for jeopardizing the safety. All right. Let's leave out the jeopardizing the safety. All right. Okay. And let's reduce the – and this is all hypothetical, of course. Yes. And let's reduce the amount of attributed loss to just the loans. Yes. But you still have this management adjustment and you have the position of trust adjustment. Is that it? You have the supervisory role. Supervisory role, but there's also more than minimal planning, right? You're not contesting that one. No. We're just focusing on these three. All right. Well, let's assume that we have the supervisory role in there and the more than minimal planning and some amount for the loan. Loans, are you sure you're not in the same place? We may very well be in a different place because the record shows that the district court was very sympathetic to Mr. Mullin's situation, gave him a six-level downward departure for his apparent behavior, and even the probation officer in the presentence report highlighted things about Mr. Mullin that were noteworthy, that were heroic, that demonstrated. One question, because your time's up. If he had reported it to the auditor, we wouldn't be here, would we? Probably. If he had reported it to the auditor, we wouldn't be here. We don't know that because the government took six years to bring charges in this case. Well, the auditor would have come in. The auditor came in when they were notified, and everything stopped then. They had to close the credit union down? We don't know that because part of the factual evidence at the sentencing was the claim that the government acted vindictively. They acted with an attempt to harm Mr. Mullin. There was a lot of bad blood. There were questions about what witnesses would have said if they were still alive. We just don't know that. That's speculation. What we do know is that the district court failed to make a distinction here on the record between my client's responsibility for the check-kiting, on the one hand, and his responsibility for what happened afterwards. But you're conceding that he was responsible for the loans, then? At some point, you seem to be arguing not. Well, he knew about the loan applications. And so you're not trying to get down below that $85,000 on the loans? I'm sorry? You're not trying to get down below the $85,000 or something? Correct. He's acknowledged that. All right. He pled guilty to that. And you understand that that manner of loss is properly attributed to him? Yes. Okay.  We'll give you a little time to wrap it up. Thank you. Mr. Weingart. May it please the Court. Gregory Weingart on behalf of the United States. If I could perhaps begin by responding to a couple of the questions that Your Honor posed to Mr. Pereira-Suarez a little bit earlier. It is the case that Judge Phillips held Mr. Mullen responsible only for the kited checks after he became aware on February 15th, 1996. So it's only for the post-February 15th. Of what was going on. And there was no dispute before the district court as to that was the amount of kited checks that were circulated through. The only question was, was he responsible or not. Do you know the answer to my calculation question? That is, if we were to count the $85,000 in loans, eliminate the rest, just hypothetically, and eliminate the substantial endangerment of the credit union, where would we be in terms of numbers? I think that it would still be lower if I understand what Your Honor is saying. But first of all. Lower than the $20,000 that he got. Lower than what he actually got after the downturn. That's correct. Because I have the guideline book. I was looking at it earlier. But I think there's two issues that I want to talk about before I. May I just, before you get up? Sure. If I understand, if you eliminate the fact that the stabilization of the credit union was affected, that then you can go ahead and reduce it to what would be between 24 and 30 points. And now he had got what the equivalent is 33, so it would have been reduced by three points. But you have to eliminate, as I understand in the calculation, the question about whether or not the credit union stabilization was affected by the conduct of Mr. Mullen. Am I correct in that? I'm sorry. I didn't follow that. That does determine. If that enhancement applies, then the loss and all the other stuff doesn't. It doesn't matter. It doesn't matter. That's what Judge Scalpel is saying. Yeah. That's correct. Because the only reason that he got the 7 was that's what took it up to 24, and it has to be at least 24 under that particular enhancement. But with regard to the $85,000 in loans, if you eliminate the kiting aspect, and obviously I don't think that you should do that. The government did argue, I have to disagree with Mr. Ferraro-Torres about that in our papers, that of course he knew that they were continuing to kite the checks because the gig would have been up. The whole idea was stall the auditors, buy more time, and the loss would be. But how does that make any sense? I mean, granted these people are somewhat naive. They're not going to discover a pot of gold in two weeks. Once he knows that they've done this terrible thing, why does any one of them think it helps to keep digging a bigger hole? I don't get it. I don't see why any reasonable person would have thought that. Because hope springs eternal, Your Honor. I mean, you just never know, and I have to say, I mean. But now we're talking about what knowledge did you show that Mullen had of what they were doing? Well, what happened was on February 15th, that's sort of the magic date, the employees, because the auditors are really pressing at the door, they finally copped to Mr. Mullen. Yeah, what's all that? That's what's going on. I asked you what knowledge did Mullen have that they were now kiting the checks after that date? Well, because what Mr. Mullen did and what I believe that Judge Phillips Please tell me what knowledge did he have? What Judge Phillips found and what knowledge it was that he had was that he was orchestrating the cover-up. He told people Please don't use terms like that. Tell me specifically what he did that showed he knew. Please don't use words like orchestrating. That's a conclusory term. Tell me exactly what he did. He announced to the employees that they were going to handle the situation internally. Yes. He ordered the employees not to talk about what happened with anyone. Yes. When the auditors began asking questions, the defendant When is that? When is that? That is in this two-week timeframe. The auditors are on the scene? The auditors Yes, because the auditor Well, they're coming to the bank and they're also calling What do you mean they're coming? Were they there or were they not there? Both. They were there and they were also calling on the phone. It's in the record somewhere? Yes. I believe that's in the 302s that were submitted in connection with the government sentencing papers. Okay. So you say that the auditors were there. He should have known they were And actually arranged for them to come Where is there any evidence that he arranged for them to kite? Well, what he did was he directed the employees to buy time and that No, he didn't do that. He said you've got to pay it back. We have the specific testimonies to what he said. Go to your relatives. Cash in your retirement. I have not found a word. Now, maybe you can point to someplace where he says go and kite some more checks. Can you do that? With the handle it, what I'm referring to is when the auditors were asking questions No, but did he say go and kite some more checks? What he told the employees was I don't care how you handle it. Just get us more time. And that's an excerpt of Record 126. That's a quote from Mr. Mullen. That's as close as you can get. Yes. I don't care how you do it. And get us more time. He admitted that he was stalling the auditors himself, not telling them what was going on. He was directing them to another employee to answer questions and saying he didn't want to have any idea what she was saying. And I'd like you to get to the other question, i.e., the substantially endangering in a minute. But my understanding of your argument in this respect is it's essentially the one outlined by Judge Scalpel. That is, he in some but-for-a-cause sort of way caused this because he, if he had gone to the auditors earlier, the extra two weeks wouldn't have happened. That's basically it. That's basically his connection to this. Well, it's that and it's also the end of loans. I understand. I understand the loans to be conceded at this point. Let's leave them aside. Well, and the other point I wanted to point out with the loans, to get back to that, is the $85,000, there were actually, in the PSR sets before, there was over $144,000 in loans that were taken out. The reason that it was reduced to $85,000 was so as to not double count money that was also involved in the kite. But one thing that I was curious – well, let's get to the other question. Let's get to the substantial. Would you explain to me how Mr. Mullins's behavior put the credit union in danger that it wouldn't have been in but for his behavior? Well, what – with regard to that particular question, I think there's – first of all, I will take it as a given, then, that the credit union was in substantial jeopardy. No, no. I want to know both of those things. I want to know, A, was it in substantial jeopardy, and, B, is it attributable to Mr. Mullins? Okay. Well, let me – that's why I was curious. Let me talk about the first thing first. What the guideline application note says is that as a consequence of the offense, the institution became insolvent, was unable on demand to refund fully any deposit payment or investment, or was so depleted of assets so as to be forced to merge with another institution, was placed in substantial jeopardy of any of the above. And there were sworn declarations that were submitted. And, again, the auditor was one of the people who submitted declarations, so he was around. I'm not sure what Mr. Perez-Suarez was referring to there. There was a 30-day awaiting period that was imposed before people could get their money. I thought that actually they started that way, but it was withdrawn right away. You haven't answered Judge Sotomayor's question. She didn't ask you for the guidelines. She asked you what – why would it have made any difference? Suppose it would have been immediately called. I'm sorry. I thought the question was, first of all, was it – No, it's all questions. All right. But second of all, how is this attributable? Given – I was going to dispute a little bit, because my understanding about the 30 days is that it actually didn't happen, that they called it for 30 days, but then they withdrew it pretty quickly. But leaving that aside, let's assume for the moment that it was in substantial danger – is that the word? Jeopardy. Jeopardy. How is any of that attributable to Mr. Mullins as opposed to what everybody else was doing? Well, it's attributable to all of them, because – No, but that's not what we have here. It has to be attributable to Mr. Mullins. Well, I guess I would submit that it can be attributable to him and to his co-schemers with regard to – because his offense includes relevant conduct and the acts that would be both his own and reasonably foreseeable, including acts that are foreseeable in the attempt to evade responsibility or being found out with regard to the offense. And so he joins the scheme at the time that he finds out about it in an attempt to prevent the regulators and others from finding out, to buy time so that if they can, they can pay the money back, and gradually over time he'll let people go. But suppose the whistle had been blown right then. Wouldn't the jeopardy to the institution have been exactly the same? I don't think that it would have been exactly the same. The institution would have been in some jeopardy. I don't dispute that. The difference would have been. Well, the difference was. There were hundreds of thousands of dollars that were outstanding. There was evidence in the record that was submitted with regard to the fact that because management was involved in the cover-up, that that had an impact on. What evidence is that? There was evidence. Point it to it, please. Yes. It is at – I'm sorry. I'm having a little bit of difficulty. I believe it's at excerpt of record 116. I can't remember with regard to if that was from the auditor or one of the two presidents of the credit union that came afterwards. But the fact that Mr. Mullen was involved played a role in more people wanting to pull their money out. But in fact, that there was this esteemed member of the community, the man that was the head of this, essentially that the institution was rotten to the core. It wasn't just a group of employees that were doing this. And when management found out, it acted responsibly. And that that exacerbated the problem. I want to get on a little different approach to this. The district judge made specific findings on the three contentions that Mr. Mullen made. What's our standard of review as far as viewing those conclusions that the district court made? It would be clearly erroneous because there are factual findings, Your Honor. All right. And the proof has to be only by a preponderance of the evidence. Is that right? I — there was no — that issue was not addressed below. There's no contention on appeal, so I would believe it'd be preponderance. Is that correct? In your opinion, is that correct? I think it's correct, yes. So then the district, in order to go ahead and say that the district court was wrong, we have to show that they were — that it was clearly erroneous. And I don't — for the reasons that I said, I don't think that that's — that it is clearly erroneous. I believe it's correct. Well, the only duty that the district judge had was to go ahead and determine this by preponderance of the evidence. To be clearly erroneous, you would have to go ahead and say that the judge didn't apply that situation. It would be required less or more. And as I tried to point out, I believe there's evidence in the record to support all of these contentions. There wasn't clearly erroneous. There was no evidentiary hearing. Was there an evidentiary hearing? There was evidence that was submitted in the form of declarations and otherwise. And the defendant didn't ask for an evidence? The defendant did not ask that those be cross-examined. So there was under-oath declarations, but the defendant did not seek to cross-examine this individual. Well, some of this stuff was just statements to the FBI agent, wasn't it? Some of it is, yes, Your Honor. But with regard to the substantial jeopardy, those were under-oath statements. It was really with regard to the — I know you don't like to use the word cover-up, but with regard to orchestrating what happened afterwards, that was more — It wasn't a very high level of evidence. I'm sorry? I say it wasn't a very high level of evidence, statements to the FBI agents as taken down by him. Well, the district — I mean, there was no request by the defense to cross-examine that. They didn't — they didn't dispute that evidence. So the district court found it to be reliable based not only on that, but also on all the other cases that she had before her. Okay. Thank you very much. Thank you. And thank you for your help. Mr. Pereira-Suarez, we'll give you about a minute. I believe Judge Newman is correct in his assessment that there's no direct evidence of Mr. Mullen directing, orchestrating some kind of cover-up. That's a characterization. That's a conclusion. And what Mr. Mullen did try to do, and that's replete in the record, he tried to remedy the harm that already had been done. I'm having a little trouble with your argument. Maybe you can help me. Here's a man that's been in the business for 30 years. Correct. He asked them to go ahead and give me time. The only way that they could get any time was to continue the car-checking. Isn't that right? No. It's going to fall apart. No. He has to know with that experience that in order to give him time. That's assuming a level of sophistication, of foreseeability that Mr. Mullen did not have, that is not developed. Actually, this all doesn't matter. And you haven't really addressed the substantial jeopardy question, because if the substantial jeopardy enhancement stands, the amount of the loss doesn't matter. There are three enhancements here. I understand that. But am I not correct in saying that the amount of the loss doesn't matter if the substantial jeopardy stands? Because it's a minimum of 24. So you haven't addressed that at all. I'll give you about 30 seconds to do it. Your Honor, there are adjustments here totaling 19 points. Any one of them would qualify. No, that's not right, because if the substantial jeopardy one stands, it's a 24 no matter what. Well, you still have 12 that are at issue, even if you don't take away the substantial jeopardy. No, you don't, because the 9 wasn't on top of the 24. It was underneath the 24. The 9 just doesn't matter. Yes. It just doesn't matter at all. And my point, repeatedly in the district court and here again, is that Mr. Mullen did not create substantial jeopardy because of what he did after February 15th. The jeopardy had already occurred. He tried to remedy the situation. He did it in a misguided way. He did it in an unsophisticated way. As it turned out, it didn't help. It merely got him in trouble. It got his wife in trouble. It got them both convicted of felonies. But he did not create that substantial jeopardy. He did not, in a sophisticated mastermind kind of way, orchestrate a cover-up. He tried the best he could to undo damage that already had occurred before he had knowledge of that damage. And what we're saying here is but for the judge's lack of inability to distinguish between the check cutting that occurred before he had knowledge. I think Mr. Weinkart is correct that that money is not in there. But thank you for your time. Thank you very much.
judges: Skopil, Noonan, Berzon